752 So.2d 582 (2000)
EXECU-TECH BUSINESS SYSTEMS, INC., Petitioner,
v.
NEW OJI PAPER COMPANY LTD., etc., Respondent.
No. SC92881.
Supreme Court of Florida.
January 20, 2000.
Rehearing Denied March 2, 2000.
Robert C. Gilbert, Coral Gables, Florida; Daniel E. Gustafson and Renae D. Steiner of Heins, Mills & Olson, Minneapolis, Minnesota; Kenneth A. Wexler, Jennifer Winter Sprengel and Marvin A Miller of Miller, Faucher, Chertow, Cafferty & Wexler, Chicago, Illinois; and Joseph R. *583 Saveri and Fabrice V. Nijhof of Lieff, Cabraser, Heimann & Bernstein, San Francisco, California, for Petitioner.
Richard E. Donovan and Ignacio E. Sanchez of Kelley, Drye & Warren, Miami, Florida, for Respondent.
SHAW, J.
We have for review Execu-Tech Business Systems, Inc. v. New Oji Paper Co., Ltd., 708 So.2d 599 (Fla. 4th DCA 1998), wherein the district court certified conflict with Wilcox v. Stout, 637 So.2d 335 (Fla. 2d DCA 1994). We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We quash Execu-Tech.
Thermal facsimile ("fax") paper, which is used in fax machines and recorders, is a special type of chemically-coated paper that creates an image when stimulated by a heated printer head. Thermal fax paper is manufactured in bulk rolls ("jumbo rolls") that are approximately forty to fifty inches wide and weigh up to 2000 pounds. Manufacturers sell jumbo rolls to "trading houses," which in turn sell the product to "converters" who cut and repackage the rolls into smaller, eight and one-half inch wide rolls suitable for retail sale. Converters then sell the rolls to wholesalers and retailers. The finished product is purchased mainly by small businesses and private consumers.
A federal investigation into wholesale price-fixing practices in this $120 million per year industry led to charges being filed against eight of the leading manufacturers and trading houses of thermal fax paper used in the United States.[1] Most of the defendantsincluding New Oji Paper Company, Ltd.pled guilty and were fined.[2] Later, a Florida user of thermal fax paper, Execu-Tech Business Systems, Inc., filed the present class action on behalf of all Florida users of thermal fax paper. The complaint alleged that during the period from February 1990 through March 1992 (i.e., the "class period") the above defendants conspired to fix the wholesale price of jumbo rolls sold throughout the nation and that this paper ultimately was sold to Florida consumers at a correspondingly inflated retail price. The complaint sought unspecified damages.
Several of the defendants responded to the complaint on the merits, but New Oji, which is a Japan-based corporation, filed a response claiming that the Florida court lacked personal jurisdiction to proceed against New Oji. The trial court agreed and dismissed the complaint against New Oji. The district court affirmed and certified *584 conflict with Wilcox v. Stout, 637 So.2d 335 (Fla. 2d DCA 1994), wherein the district court held that a trial court may properly exercise personal jurisdiction over a foreign corporation based on a conspiracy theory of liability under Florida's long-arm statute.
New Oji asserts that the following circumstances obtain: New Oji is a Japanese corporation; New Oji sells jumbo rolls of thermal fax paper in only Japan, not the United States; New Oji maintains no office in Florida; and Execu-Tech has not shown that any New Oji paper was sold in Florida during the class period. New Oji claims that the trial court properly dismissed the complaint for lack of personal jurisdiction. We disagree.
A trial court's ruling on a motion to dismiss based on a question of law is subject to de novo review.[3] The law governing personal jurisdiction over a foreign corporation is clear. This Court in Venetian Salami Co. v. Parthenais, 554 So.2d 499 (Fla.1989), set forth a two-step process for determining whether personal jurisdiction exists:
In determining whether long-arm jurisdiction is appropriate in a given case, two inquiries must be made. First, it must be determined that the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of the statute; and if it does, the next inquiry is whether sufficient "minimum contacts" are demonstrated to satisfy due process requirements.
Venetian Salami, 554 So.2d at 502 (quoting Unger v. Publisher Entry Service, Inc., 513 So.2d 674, 675 (Fla. 5th DCA 1987)).
The first prongi.e., the statutory prongof the Venetian Salami standard is governed by Florida's long-arm statute and bestows broad jurisdiction on Florida courts. A court can exercise personal jurisdiction, inter alia, whenever a foreign corporation commits a "tortious act" on Florida soil.[4] The second prongi.e., the constitutional prongis controlled by United States Supreme Court precedent interpreting the Due Process Clause and imposes a more restrictive requirement. A court can exercise personal jurisdiction only if the foreign corporation maintains "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'"[5]
*585 Execu-Tech's present complaint comports with both prongs of the Venetian Salami standard. First, the complaint satisfies the statutory prong, for the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of Florida's long-arm statute. As noted above, Execu-Tech alleged that New Oji and other major manufacturers and trading houses of thermal fax paper deliberately conspired to fix the wholesale price of their product throughout the United States, including Florida. This conduct constitutes a violation of the Florida Deceptive and Unfair Trade Practices Act (the "Act"), which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[6] The Act authorizes a private cause of action for damages.[7] Thus, according to Execu-Tech's complaint, New Oji and the other conspirators committed a tortious act[8] (i.e., a violation of the Act) on Florida soil and subjected themselves to the jurisdiction of Florida courts.[9]
Second, Execu-Tech's complaint satisfies the constitutional prong of the Venetian Salami standard, for the complaint alleges sufficient minimum contacts between Florida and New Oji to satisfy due process concerns. Unlike other "personal jurisdiction" cases, the present case is not a "products liability" or "breach of contract" casei.e., Execu-Tech is not alleging that New Oji paper is defective in any way or that New Oji violated an express agreement with Florida consumers. Rather, the present case is a "price-fixing" casei.e., Execu-Tech is alleging that the conspirators introduced a "defective" price into the Florida market. The key focus is notas New Oji contendson the nexus between (1) the forum state, (2) the foreign corporation, and (3) the product (i.e., the paper manufactured by New Oji), but on the nexus between the (1) forum state, (2) the foreign corporation, and (3) the price (i.e., the inflated price paid by Florida consumers for the conspirators' price-fixed paper).
Thus, the fact that Execu-Tech has not at this point shown conclusively that any New Oji paper was sold in Florida is not dispositive, for Execu-Tech has alleged the following: (1) The conspirators (including New Oji) are the leading producers and trading houses of thermal fax paper used in the United States; (2) most of the conspirators (including New Oji) pled guilty in federal court to engaging in a nationwide criminal scheme to fix the wholesale price of their product at an artificially high level; and (3) thermal fax paper produced and distributed by the conspirators was sold at a correspondingly inflated retail price in every state, including Florida, during the class period. Based on these allegations *586 and the supporting affidavits, we conclude that the nexus between New Oji and the retail price paid in Florida for price-fixed thermal fax paper is sufficiently clear and direct to satisfy jurisdictional requirements.
As noted above, the Florida Deceptive and Unfair Trade Practices Act is codified in part II, chapter 501, Florida Statutes (1991), and Florida's long-arm statute is codified in section 48.193, Florida Statutes (1991). These statutes gave New Oji fair notice of the applicable Florida law in this area at the time New Oji embarked upon its criminal scheme to bilk consumers throughout the United States. Because the Florida market was embraced within this nationwide scheme, New Oji reasonably should have expected to be haled into court in this state if "caught."[10] Actual physical presence in Florida is not required in order to establish personal jurisdiction under these circumstances.[11] As long as New Oji and the other conspirators sought to use the benefits afforded by Florida law to participate in (and profit from) the thermal fax paper market in this state, then they should have been prepared to follow Florida law governing their price-setting activities.[12]
Execu-Tech is asking only that the loss provisions of the Florida Deceptive and Unfair Trade Practices Act be applied to New Oji and the other conspirators to enable Florida consumers to recoup the losses they sustained as a result of the conspirators' illegal acts. Nothing in the long-arm statute or constitution bars such an action. We hold that the "minimum contacts" doctrine operates in an evenhanded manner in the present case. The same "minimum contacts" that allowed the conspirators to exploit Floridians in the marketplace may now be used by Floridians to establish a jurisdictional basis for recouping their losses in a court of law. The trial and district courts erred in ruling otherwise.
We quash Execu-Tech and approve Wilcox to the extent that it is consistent with this opinion.
It is so ordered.
HARDING, C.J., and WELLS, ANSTEAD and PARIENTE, JJ., concur.
NOTES
[1] Charges were filed against the following businesses: (1) Appleton Papers, Inc., a Wisconsin-based manufacturer of thermal fax paper; (2) Elof Hansson Paper & Board, Inc., a New York-based trading house for New Oji Paper Company of Japan; (3) Kanzaki Specialty Papers, Inc., a Massachusetts-based manufacturer of thermal fax paper; (4) Mitisubishi Corporation, a Japan-based trading house for Mitisubishi Paper Mills Company, Ltd.; (5) Mitsubishi International Corporation, a New York-based trading house for Mitisubishi Paper Mills Company, Ltd.; (6) Mitisubishi Paper Mills Company, Ltd., a Japan-based manufacturer of thermal fax paper; (7) New Oji Paper Company, Ltd., a Japan-based manufacturer of thermal fax paper; and (8) Nippon Paper Industries Company, Ltd., a Japan-based manufacturer of thermal fax paper. Execu-Tech alleged in the present complaint that the above corporations sold the following quantities of thermal fax paper in the United States: Appleton, $45 million in 1991; Elof Hansson, $3 million from November 1991 until March 1992; Kanzaki, $40 million in 1991; Mitisubishi Corporation, $5 million in 1991; Mitsubishi International, $5 million in 1991; Mitisubishi Paper Mills, (no amount listed); New Oji (no amount listed); Nippon, $6.1 million from February 1990 until March 1992.
[2] The charges were disposed of as follows (according to Execu-Tech's present complaint): New Oji, Kanzaki, Elof Hansson, and the Mitisubishi companies all pled guilty; Oji was fined $1.75 million; Kanzaki was fined $4.725 million; Elof Hannson was fined $200,000; and the Mitisubishi companies were fined a total of $1.26 million. The charges against Appleton and Nippon were still pending at the time the present complaint was filed.
[3] See, e.g., Rittman v. Allstate Ins. Co., 727 So.2d 391 (Fla. 1st DCA 1999).
[4] Florida's long-arm stature provides in relevant part as follows:

48.193 Acts subjecting person to jurisdiction of courts of state.
(1) Any person, whether or not a citizen or resident or this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself and, if he is a natural person, his personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
(b) Committing a tortious act within this state.
(c) Owning, using, or possessing any real property within this state.
. . . .
(f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
1. The defendant was engaged in solicitation or service activities within this state; or
2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.
(g) Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.
§ 48.193(1), Fla. Stat. (1991) (emphasis added).
[5] See International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
[6] Section 501.204, Florida Statutes (1991), provides in relevant part as follows:

501.204 Unlawful acts and practices.
(1) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
(2) It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretation of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1).
§ 501.204, Fla. Stat. (1991) (emphasis added).
[7] Section 501.211, Florida Statutes (1991), provides in relevant part as follows:

501.211 Other individual remedies.
. . . .
(2) In any individual action brought by a consumer who has suffered a loss as a result of a violation of this part, such individual may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105....
§ 501.211, Fla. Stat. (1991) ( emphasis added).
[8] See generally Prosser and Keeton on The Law of Torts 2 (W. Page Keeton, general ed., 5th ed. 1984) ("Broadly speaking, a tort is a civil wrong, other than a breach of contract, for which the court will provide a remedy in the form of an action for damages."). Cf. Snipes v. West Flagler Kennel Club, Inc., 105 So.2d 164 (Fla.1958) (holding that civil conspiracy itself may constitute a tort).
[9] See supra note 4.
[10] See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) ("[T]he foreseeability that is critical to due process analysis is ... that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.").
[11] See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ("[W]e have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.").
[12] Cf. International Shoe Co. v. Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ("But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the law of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.").