964 So.2d 228 (2007)
ARCH ALUMINUM & GLASS CO., INC., a Florida corporation, Appellant,
v.
Danny M. HANEY, Desert Glass Products, LLC, a foreign corporation, Ed Hayes, and Matthew Hale, Appellees.
No. 4D06-2463.
District Court of Appeal of Florida, Fourth District.
September 5, 2007.
*230 Beverly A. Pohl, Peter R. Goldman, and Adam G. Rabinowitz of Broad and Cassel, Fort Lauderdale, for appellant/cross-appellee.
John M. Mullin of Tripp Scott, P.A., Fort Lauderdale, for appellees/cross-appellants Desert Glass Products, LLC, and Matthew Hale.
WARNER, J.
Arch Aluminum & Glass Co. appeals an order of the trial court dismissing its complaint against Desert Glass Products, LLC, for lack of personal jurisdiction. Co-defendant Matthew Hale, a Georgia resident and former employee of Arch, cross-appeals the trial court's denial of his motion to dismiss the complaint for lack of personal jurisdiction. As Desert Glass did not commit a tort whose main focus was Florida, nor did Desert Glass have sufficient minimum contacts with Florida, we affirm the trial court's order of dismissal as to Desert Glass. We reverse, however, the trial court's denial of Hale's motion to dismiss, because Hale neither committed a tort in Florida nor was engaged in continuous business activity in the state at the time the complaint was filed.
Arch is a Florida corporation that acts as a nationwide fabricator and distributor of architectural aluminum and glass. From 1995 through April 2002, defendant Matthew Hale, a Georgia resident, worked as national sales manager for Arch. As national sales manager, Hale had full and authorized access to proprietary information developed by Arch in Florida, such as client lists, sales projections, prior sales data, business plans, and financial statements for Arch's operations across the country. From approximately April 30, 2002, through April 2003, Hale worked as an independent contractor for Arch, focusing on marketing work.
Danny Haney worked at Arch until late November 2002, serving as its Director of Manufacturing. In October 2002, Haney was interested in forming a glass products company with the financial backing of Larry Jaynes of Texas. Haney ultimately asked Hale if he would provide him with copies of marketing studies that Hale had prepared on behalf of Arch concerning the glass fabricating markets in North America with the best potential for development.
During the course of their communications in the fall of 2002, Hale suggested to Haney that he consider starting a glass fabricating facility in Las Vegas, Nevada. Hale made this suggestion in part because Arch did not have a fabricating facility there, though Arch did compete in the Las Vegas market from its Phoenix plant. Haney commissioned Hale to provide various marketing studies of the Las Vegas market.
On December 27, 2002, when Haney resided in Florida, Hale sent Haney an e-mail attaching various marketing documents relevant to the Las Vegas market. The documents included a survey of Las Vegas glass companies conducted in December 2002 and a nationwide "Metro Area Analysis" of various markets. The Metro Area Analysis was a nationwide comparison of the competitive situation of *231 numerous markets based on a variety of factors (such as population growth, housing starts, and the number of competing tempering facilities). Jaynes paid Hale for the Metro Area Analysis.
The Metro Area Analysis determined that Las Vegas was the most attractive market. Haney recalled Hale having previously prepared a Metro Area Analysis report for Arch. Hale, however, claimed that he had created this specific Metro Area Analysis document in December 2002, though he acknowledged generating similar documents for Arch over the last three or four years of his employment there. Hale completed the analysis of the metropolitan areas while he was an independent contractor and sold it both to Arch, who was evaluating a San Francisco facility, and the incorporators of Desert Glass.
Based upon the report, Jaynes and Haney decided to start a glass production business in Las Vegas. On January 13, 2003, they incorporated defendant Desert Glass Products, LLC, in Nevada. Desert Glass sells fabricated glass products, primarily in western states. Desert Glass has its principal office in Las Vegas, and it began full operations at some point after July 2003. Desert Glass is currently a direct competitor of Arch in some western geographic markets, but not in Florida.
In October 2003, Hale started working as a full-time employee of Desert Glass, where he stayed until the end of 2005. Desert Glass also hired James Fendley, Arch's Phoenix area sales representative. Fendley met with Hale, who advised Fendley to target Arch customers in the Phoenix area. Fendley attested in his affidavit that Hale provided him with "an Arch business plan for the Phoenix region," which "contained all of Arch's customer names, prior sales, and future sales projections for the Phoenix area." This document is referred to as the "Phoenix worksheet." The Phoenix worksheet was prepared for Arch in 2001 from information supplied by Arch's sales representatives, including Fendley. It contained a customer list along with Arch's sales figures for 1999, 2000, and part of 2001. The Phoenix worksheet also includes an estimate of potential future sales that each customer would provide. Hale was in Las Vegas when he gave the Phoenix worksheet to Fendley. Fendley testified that Hale would have received this worksheet in his capacity as national sales manager of Arch. This would have occurred during Hale's full-time employment with Arch, which ended in April 2002.
Arch sued Desert Glass and Hale in Florida, alleging the following tort claims against the defendants: misappropriation of trade secrets; unfair competition; aiding and abetting; and conspiracy. Arch alleged that Hale, after leaving Arch's employment, and while acting on behalf of Desert Glass, utilized Arch's confidential business information to build a business plan for Desert Glass to specifically target Arch's customers. Hale was instructed, under Arch's employee handbook, that business plans, pricing strategies and customer lists constituted proprietary information that belonged to Arch. The complaint alleges Hale misappropriated trade secrets by using this confidential information to target Arch customers and develop Desert Glass' business in areas where it did not otherwise conduct business. Nowhere in the complaint did Arch mention either the Metro Area Analysis or the Phoenix worksheet.
Both Hale and Desert Glass moved to dismiss the Florida complaint for lack of personal jurisdiction. Both Jaynes and Hale filed affidavits in support of these motions. Jaynes attested that Desert Glass did no business in Florida. Hale *232 attested that he was a non-resident, had not been in Florida for at least two years, and did not use any confidential information belonging to Arch. Haney filed an affidavit saying that he had commissioned the Metro Area Analysis and that he had seen the custom tempering analysis of all major areas when Hale had produced it for Arch.
At an earlier hearing on discovery, both Hale and Fendley testified extensively on both the Metro Area Analysis and the Phoenix study. Hale testified that he had prepared the present Metro Area Analysis while he was an independent contractor and used generally available public information, such as housing starts and population. He had used the same general analysis of the metropolitan regions both during his employment with Arch and later in consulting work for Arch. At the evidentiary hearing, the court determined that the Metro Area Analysis was "no great secret." The court noted that "[p]robably around the same time that [the Metro Area Analysis] was generated, you could have picked up Time Magazine and learned that Las Vegas was the hottest market in the country."
At the hearing on the motion to dismiss for lack of personal jurisdiction, the parties presented the affidavits and made an extensive legal argument to the court. After a full hearing on the issue, the trial court dismissed the complaint against Desert Glass because Desert Glass lacked minimum contacts with Florida. However, it denied Hale's motion to dismiss. Arch appeals the dismissal of Desert Glass, and Hale appeals the order denying his motion to dismiss. We review de novo these rulings. See Wendt v. Horowitz, 822 So.2d 1252 (Fla.2002).
In Venetian Salami Co. v. Parthenais, 554 So.2d 499, 502 (Fla.1989), our supreme court set forth a two-step inquiry for determining whether a Florida court has personal jurisdiction over a nonresident. First, it must be determined that the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of Florida's long-arm statute, section 48.193, Florida Statutes. Id. If so, the next inquiry is whether sufficient "minimum contacts" are demonstrated to satisfy due process requirements. Id. "Both parts must be satisfied for a court to exercise personal jurisdiction over a non-resident defendant." Am. Fin. Trading Corp. v. Bauer, 828 So.2d 1071, 1074 (Fla. 4th DCA 2002).
Under Florida's long-arm statute, a party is subject to jurisdiction in Florida by "[c]ommitting a tortious act within this state." § 48.193(1)(b), Fla. Stat. A defendant's physical presence in this state is not required in order to "commit a tortious act" within Florida. Wendt, 822 So.2d at 1260. Committing a tortious act within Florida under section 48.193(1)(b) can occur by making telephonic, electronic, or written communications into this State, provided that the tort alleged arises from such communications. Id. at 1253.
Section 48.193(1)(b) "encompasses conduct where the defendant acts outside Florida to directly cause injury or damage a person within this state." Korman v. Kent, 821 So.2d 408, 410 (Fla. 4th DCA 2002) (emphasis added). However, in Korman, this court was careful to explain that section 48.193(1)(b) does not apply merely because a Florida resident suffers damages: "If the Legislature intended for this provision to encompass all tortious acts which were complete outside Florida, but ultimately have consequences here only because a Florida resident suffers damages, we believe it would be incumbent on the Legislature to make that statutory purpose clear in the plainest of language." Id. at 411.
*233 The constitutional prong of Venetian Salami "is controlled by United States Supreme Court precedent interpreting the Due Process Clause and imposes a more restrictive requirement" than the statutory prong. Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co., 752 So.2d 582, 584 (Fla.2000). Due process requires that a nonresident has sufficient minimum contacts with the forum state such that the maintenance of a suit does not offend "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
In analyzing whether a nonresident has the requisite minimum contacts with a forum state to justify personal jurisdiction, courts should determine whether the nonresident's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In order for a nonresident defendant to anticipate being haled into a Florida court, it is essential that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within Florida, thus invoking the benefits and protections of its laws. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). However, "physical presence is not necessarily required to satisfy the constitutionally mandated requirement of minimum contacts." Wendt, 822 So.2d at 1257-58.
Arch's jurisdictional claim against Desert Glass fails on both prongs of Venetian Salami. First, it has not proved that Desert Glass committed a tortious act in Florida. As Arch notes in its brief, misappropriation can be broken down into misappropriation by improper acquisition or misappropriation by unauthorized disclosure or use. See § 688.002(2)(a), (b), Fla. Stat. (2006). The gist of its claim at the hearing on the motion to dismiss, and now on appeal, is that the Metro Area Analysis and the Phoenix worksheet constituted confidential information of Arch which was misappropriated by Hale and by Desert Glass, constituting tortious acts committed in Florida. We disagree, concluding that no tortious act occurred in Florida.
At an earlier hearing the trial court found that the Metro Area Analysis did not contain confidential information. Our review of the analysis in the record confirms this assessment. Arch alleged in its complaint that the confidential information Hale allegedly used consisted of Arch's client lists, sales projections, prior sales data, business plans, and financial statements. The Metro Area Analysis contains none of that information.
Furthermore, both the Metro Area Analysis and the Phoenix study were not improperly acquired by Hale. Whatever information he acquired occurred during and in his capacity as Arch's sales manager. Only his later distribution of the Metro Area Analysis and the Phoenix study, both of which occurred after he left the company, could be said to be a "misappropriation" of confidential information.
After he was hired by Desert Glass and resided in Las Vegas, Hale sent the Phoenix study to Fendley in Phoenix. It discussed Arch's Phoenix customers and sales volume. This study did contain confidential information. However, the distribution of the study from Las Vegas to Phoenix did not constitute the commission of a tort in Florida. See Korman, 821 So.2d at 411. It is true that an injury to a corporation must occur in some legally significant situs, such as the place of incorporation or a place designated for the performance of a contract. See Int'l Hous. *234 Ltd. v. Rafidain Bank Iraq, 893 F.2d 8, 11 n. 3 (2d Cir.1989); see also Boswell v. Boswell, 902 So.2d 844 (Fla. 4th DCA 2005) (in shareholder derivative action, any injury to the corporation would have occurred in Missouri, the place of incorporation and the principal place of business). However, we reject Arch's suggestion that the situs of an injury to a corporation necessarily occurs at its place of incorporation for purposes of a personal jurisdiction calculus. Even if Arch suffered damage, it would have been a loss of western clients and the reduction of revenues from its Phoenix operation. No tort occurred in Florida. See Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp., 439 F.2d 428, 432-35 (2d Cir.1971) (holding that a Michigan corporation did not commit tortious act causing injury in New York where the Michigan corporation induced the New York plaintiffs' experienced sales employees to leave plaintiffs and use confidential information to woo away plaintiffs' customers in Kentucky and Pennsylvania; the situs of injury was where the plaintiffs lost business); see also Spectacular Promotions, Inc. v. Radio Station WING, 272 F.Supp. 734, 737 (E.D.N.Y.1967) ("The place where the plaintiff lost business would normally be a forum reasonably foreseeable by a tortfeasor"); compare Sybron Corp. v. Wetzel, 46 N.Y.2d 197, 204-06, 413 N.Y.S.2d 127, 385 N.E.2d 1055 (1978) (finding injury to be felt in New York where defendant's out-of-state act of misappropriation of trade secrets threatened significant loss of New York sales).
As to the Metro Area Analysis, even if it had contained confidential information listed in the complaint, which it did not, Hale provided it to Haney and Jaynes prior to the incorporation of Desert Glass. Arch contends that Desert Glass should be charged with its promoters' tortious conduct in obtaining the document. Arch cannot cite to any case law or statute supporting its theory, which runs contrary to the common law rule that a "corporation is not liable for torts which its promoters committed before it came into existence." See 1A Fletcher Cyclopedia Corporations § 218. We reject Arch's promoter theory of liability for Desert Glass based upon the common law rule.
Arch also contends that Desert Glass should be liable as a conspirator in the use of confidential information. However, as noted before, the tort did not occur in Florida, and neither did the conspiracy. Arch relies heavily upon Machtinger v. Inertial Airline Services, Inc., 937 So.2d 730 (Fla. 3d DCA 2006), and Execu-Tech Business Systems, Inc. v. New Oji Paper Co. Ltd., 752 So.2d 582 (Fla.2000), in support of its theory that the alleged conspiracy in this case gives rise to personal jurisdiction over Desert Glass. In Machtinger, a Florida company sued its own employees and an Ohio company for fraud in connection with the Ohio company seeking payment from the Florida company for work done in Ohio. The Florida company's employees had sent several fraudulent invoices to the Florida company to authorize payment to the Ohio Company, and the Florida company had countersigned checks in Florida to pay for those invoices. The Third District held that the fraudulent misrepresentations were sent to Florida and resulted in damage in Florida when the company authorized payment of those invoices. Thus, because a tort was committed in Florida by sending fraudulent communications into Florida and approval of those payments was made in Florida, the Ohio company could be liable on a conspiracy theory for the tort.
In Execu-Tech Business Systems, Inc. v. New Oji Paper Co., 752 So.2d 582 (Fla. 2000), the supreme court held that a foreign corporation was subject to jurisdiction in Florida for conspiring with other paper *235 producers to fix the price of fax paper nationwide, even though the evidence did not show that the foreign corporation's paper was sold in Florida. The court explained:
The key focus is not  as New Oji contends  on the nexus between (1) the forum state, (2) the foreign corporation, and (3) the product (i.e., the paper manufactured by New Oji), but on the nexus between the (1) forum state, (2) the foreign corporation, and (3) the price (i.e., the inflated price paid by Florida consumers for the conspirators' price-fixed paper).
Id. at 585. Accordingly, our supreme court concluded that "[a]s long as New Oji and the other conspirators sought to use the benefits afforded by Florida law to participate in (and profit from) the thermal fax paper market in this state, then they should have been prepared to follow Florida law governing their price-setting activities." Id. at 586.
Both Machtinger and Execu-Tech dealt with tortious conduct directed at Florida and occurring at least in part in Florida. The tortious conduct in this case, however, occurred outside of Florida where the trade secrets were misappropriated. The "focal point" of the effects of the misappropriation was in the west where Desert Glass competed with Arch. It was not directed at Florida, nor did it seek the benefits of Florida law or affect Florida consumers in any way.
Arch did not prove that Desert Glass committed a tort in Florida, nor did it conspire to commit a tort in Florida. Moreover, there are no minimum contacts between Desert Glass and Florida. Desert Glass operates exclusively in the western United States. It does not compete for customers in Florida or have any business interests in this state. Thus, the second prong of Venetian Salami was not proved either. As Arch did not establish personal jurisdiction over Desert Glass, we affirm the trial court's ruling.
As to Hale, after the trial court denied his motion to dismiss for lack of personal jurisdiction, Hale answered the complaint and filed a counterclaim for breach of contract against Arch. The complaint alleged that Hale had a consulting agreement with Arch after Hale left Arch's employment. Arch failed to pay Hale in accordance with the terms of the agreement and prematurely terminated the agreement. Hale sues for six months of payments due under the agreement. Once the counterclaim was filed, Arch moved to dismiss his appeal on the ground that the filing of the permissive counterclaim waives his right to contest personal jurisdiction. Hale, on the other hand, asserts that the counterclaim was compulsory.
A compulsory counterclaim does not waive a personal jurisdiction defense, because a compulsory counterclaim is waived if not asserted in the answer. Cumberland Software, Inc. v. Great Am. Mortgage Corp., 507 So.2d 794, 796 (Fla. 4th DCA 1987). However, a defendant waives a challenge to personal jurisdiction by seeking affirmative relief, because such requests are logically inconsistent with an initial defense of lack of jurisdiction. Babcock v. Whatmore, 707 So.2d 702, 704 (Fla. 1998). In Babcock, the supreme court agreed with the reasoning of the majority of federal courts, which have held that "`the filing of a permissive counterclaim is a request for affirmative relief which waives an objection to personal jurisdiction notwithstanding that the objection is timely made.'" Id. (quoting Hubbard v. Cazares, 413 So.2d 1192 (Fla. 2d DCA 1981)) (emphasis added).
Rule 1.170 defines both compulsory and permissive counterclaims:

*236 (a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, provided it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. . . .
(b) Permissive Counterclaim. A pleading may state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim
In Londono v. Turkey Creek, Inc., 609 So.2d 14, 20 (Fla.1992), our supreme court adopted the "logical relationships" test for determining whether a claim was compulsory:
A claim has a logical relationship to the original claim if it arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant.
Id. (citations omitted). Later, the supreme court stressed that a compulsory counterclaim must arise out of the same transaction or occurrence as the plaintiff's claim. See Aguilar v. Southeast Bank, N.A., 728 So.2d 744, 746 (Fla.1999).
In its motion to dismiss, Arch states that it "never alleged that Hale's independent contracting agreement was terminated because of his tortious conduct." To the contrary, the answer to the counterclaim states:
24. As its third affirmative defense, Arch would state that the Counter-Plaintiff was appropriately terminated based upon the allegations more thoroughly set forth in the Amended Complaint which are incorporated herein by reference.

Having used the same claims both offensively and defensively against Hale's counterclaim, we conclude that Arch cannot therefore claim that the two do not have a logical relationship. See In re Recombinant DNA Tech. Patent and Contract Litig., 874 F.Supp. 904, 920 (S.D.Ind.1994). Surely, if Hale had sued first, and Arch had defended with an affirmative defense that Arch was properly terminated because of his misappropriation of trade secrets, Arch's counterclaim for misappropriation would have been compulsory. As the compulsory counterclaim rule is a rule to promote judicial efficiency, see Londono, 609 So.2d at 19, it promotes judicial economy for the claim and the counterclaim to be resolved in the same proceeding where the claim constitutes the defense to the counterclaim. We therefore deny the motion to dismiss the appeal.
We thus proceed to the issue of jurisdiction over Hale. Hale contends that he did not commit a tort in Florida. Arch asserts jurisdiction over Hale either under section 48.193(1)(b) or section 48.193(2).[1] We consider both sections.
Section 48.193(1)(b), Florida Statutes, provides Florida jurisdiction where a defendant commits a tortious act in Florida. As we have already noted, Wendt holds that the physical presence of the defendant is not necessary when a communication into Florida constitutes a tortious act. However, Wendt also requires that the cause of action arise from the communication *237 into Florida. In this case, Hale only sent one e-mail into Florida containing the results of the Metro Area Analysis. However, that document contained none of the confidential information alleged in the complaint. Arch's cause of action, as set forth in its amended complaint, does not depend upon the transmission of the Metro Area Analysis study to Haney in Florida and thus its transmission does not constitute the commission of a tort in Florida. See Carlyle v. Palm Beach Polo Holdings, Inc., 842 So.2d 1013 (Fla. 4th DCA 2003).
Hale did distribute the Phoenix study, which did contain confidential customer lists and sales information, but the distribution of that list occurred between Nevada and Arizona. As explained above, this action did not constitute the commission of a tortious act in Florida. See, e.g., Korman, 821 So.2d at 411.
Arch also argues that Florida has jurisdiction over Hale under section 48.193(2), which provides:
A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.
(emphasis supplied). The statutory use of the present tense verb "is engaged" shows that jurisdiction under this subsection requires current activity. Cf. Gibbons v. Brown, 716 So.2d 868 (Fla. 1st DCA 1998) (no jurisdiction when based upon the non-resident filing suit in Florida two years earlier: passage of time precluded assertion of jurisdiction because defendant was not engaged in substantial and not isolated activity). That activity is measured from the filing of the suit backward for a period of years.
While Hale could be said to have been engaged in substantial and not isolated activity in the state until the time that he ceased employment with Arch, his employment ended in 2002, and Hale was not added as a defendant to this suit until 2005. Even if the time of his consulting work is added, that ended in April 2003, two years prior to the filing of the suit against him. Since that time Hale has not engaged in any activity in this state. Therefore, he is not subject to jurisdiction under section 48.193(2).
Our decision in Hatfield v. AutoNation, Inc., 915 So.2d 1236 (Fla. 4th DCA 2005), cited by Arch for support, is distinguishable. There, Hatfield, a Texas resident, was a general manager of an AutoNation dealership in Houston. He signed a confidentiality and non-compete agreement which contained a forum selection clause designating Florida as the forum. He resigned his position and, contrary to his covenant not to compete, took a position with a competing auto dealer in Texas. AutoNation sued in Florida to enjoin Hatfield from breaching the covenant not to compete and to prevent his misappropriation of trade secrets. Hatfield moved to dismiss for lack of personal jurisdiction, which the trial court denied. Although noting that this was a close question, this court affirmed, explaining that Hatfield attended some meetings in Florida and had regular and frequent contact with AutoNation's Florida corporate headquarters, in addition to his agreement to the forum selection clause. We concluded that this combination of factors were sufficient to show that Hatfield had substantial and not isolated contact with Florida. Although Hatfield had resigned his position with AutoNation, suit was filed immediately thereafter. Moreover, the claim arose from his contractual agreement not to compete with AutoNation, and he had agreed to the forum selection clause. None of these facts are present in this *238 case, as Hale was not sued until at least two years after Hale had left the company, and Hale did not enter into any agreement with Arch that included a forum selection clause.
Concluding that Hale did not commit a tortious act in Florida, and is not engaged in any activity in the state, we reverse the trial court's order denying the motion to dismiss for lack of personal jurisdiction and remand for dismissal of the complaint against Hale. Because we have concluded that the counterclaim of Hale is compulsory, the trial court should also dismiss that claim. We affirm the trial court's dismissal of the complaint against Desert Glass.
Affirmed in part; reversed in part.
KLEIN and HAZOURI, JJ., concur.
NOTES
[1] Although several other statutory grounds were mentioned in the complaint, these are the only plausible sources of jurisdiction.